AO 106 (Rev. 04/10) Application for a Search Warrant

FILED

JUL 17 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  **19MJ2992** |
| One Black Reevplus C3701A Cellular Phone International Mobile Equipment Identity (IMEI) 861273030758123 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A1

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. Section 1324 | Alien Smuggling, Conspiracy to Commit Alien Smuggling |

The application is based on these facts:

See Attached Affidavit incorporated herein

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Cory Anderson, United States Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/17/19

_____
*Judge's signature*

City and state: San Diego, California

Karen S. Crawford, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Cory Anderson, having been duly sworn, do hereby state that the following is true to my knowledge and belief:

## INTRODUCTION

1.     I make this affidavit in support of an application for a warrant to search the following electronic devices, as further described in Attachments A1, A2, A3, and A4, respectively (incorporated herein by reference), and seize evidence of crimes, specifically, violations of Title 8, United States Code, Section 1324, as more particularly described in Attachments B1, B2, B3, and B4, respectively:

One Black Reevplus C3701A Cellular Phone
International Mobile Equipment Identity (IMEI) 861273030758123
**(Target Device 1)**

One NYX xyn306 Cellular Phone
S/N: L201809601131
IMEI: 352533096011311
**(Target Device 2)**

One Samsung Cellular Phone
S/N: R58K948JZ7Y
IMEI: 356552092830926
**(Target Device 3)**

One NYX xyn306 Cellular Phone
S/N: L201812702285
IMEI: 352533097022853
**(Target Device 4)**

This search supports an investigation and prosecution of Ronald Thomas, Jr. ("THOMAS") for the crime mentioned above.  A factual explanation supporting probable cause follows.

2.     A United States Border Patrol (USBP) agent seized **Target Device 1** from THOMAS on June 1, 2019, when he was arrested while transporting two illegal aliens, Yimy Rosas-Marcelino ("ROSAS") and Marcial Romero-De Los Santos ("ROMERO"), into the United States in a vehicle near Calexico, California.  A USBP agent seized **Target**

1   **Devices 2 and 3** from ROSAS and **Target Device 4** from ROMERO, on June 1, 2019, when
2   they were arrested at the same time as THOMAS. **Target Devices 1-4** are currently in the
3   possession of United States Border Patrol Asset Forfeiture Office Evidence Vault, located
4   at 311 Athey Ave, San Ysidro, California.

5       3.    Based on the information below, there is probable cause to believe that a search
6   of **Target Devices 1-4** will produce evidence of the aforementioned crime, as more
7   particularly described in Attachments B1, B2, B3, and B4, respectively (incorporated herein
8   by reference).

9       4.    The information contained in this affidavit is based upon my experience and
10  training, and consultation with other federal, state, and local law enforcement agents.
11  Dates, times and amounts are approximations unless otherwise noted.   Because this
12  Affidavit is being submitted for the limited purpose of establishing probable cause to obtain
13  a warrant to search **Target Devices 1-4**, more accurately described herein, and their
14  contents, I have not included every aspect of the investigation.  In addition, the information
15  contained in this Affidavit is based upon review of various official reports, upon
16  conversations with other U.S. Border Patrol Agents, and my personal observations and
17  knowledge.

18  **TRAINING AND EXPERIENCE**

19      5.    I have been employed by the USBP since 2008, and am currently assigned to
20  the San Diego Sector Boulevard Station. I graduated from the Border Patrol Basic Academy
21  at the Federal Law Enforcement Training Center in Artesia, New Mexico.  I am currently a
22  member of the Boulevard Station Abatement Team.  I am a Federal Law Enforcement
23  Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and
24  have been a Federal Law Enforcement Officer for ten years.  I am authorized by Rule 41(a)
25  Federal Rules of Criminal Procedure to make applications for search and seizure warrants
26  and serve arrest warrants.  I have experience and have received training with respect to
27  conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21
28  of the United States Code.

*Affidavit in Support of Search Warrant*                    2

6.    My current duties involve investigations into alien smuggling organizations. During my tenure with USBP, I have regularly and routinely engaged in surveillance and apprehension of those engaged in immigration offenses. I have interviewed defendants and witnesses regarding their alien smuggling and illegal trafficking of controlled substances. I routinely use tools to link related alien and narcotics smuggling subjects and information via electronic equipment and telephones. I have assisted in the issuance of arrest warrants, search warrants, and seizure warrants in support of alien and narcotics smuggling investigations.    I also have assisted in prosecuting various members of smuggling organizations, including drivers, distributers, foot guides, and load house operators. I also investigate and assist in the prosecution of aliens who utilize illegally-obtained, counterfeit, altered or genuine immigration documents to illegally gain entry or remain in the United States.

7.    Through my training and experience, I have gained knowledge and insight into the typical workings of alien and drug smuggling criminal organizations. I have also gained information as to the operational habits of persons who make their living as alien and narcotics smugglers.    I have become familiar with their behavior, speech, routes and methods of operation, particularly methods designed to avoid detection and apprehension by law enforcement officers.

8.    Through the course of my training, investigations, prior law enforcement experience, and conversations with other law enforcement personnel, I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones and portable radios to maintain communications with co-conspirators in order to further their criminal activities. I am also aware that it is a common practice for alien smugglers to communicate with the smuggled aliens regarding smuggling arrangements and payment utilizing cellular telephones and portable radios. Alien smuggling conspiracies generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail

1  messages referring to the arrangements of travel and payment, names, photographs, text
2  messages, and phone numbers of co-conspirators and aliens to be smuggled.

3      9.    Based upon my training and experience as a USBP agent, and consultations
4  with law enforcement officers experienced in alien smuggling investigations, I know that
5  persons engaged in alien smuggling activities tend to use cellular telephones for
6  communications, records, or data including but not limited to emails, text messages,
7  photographs, audio files, videos, or location data, for the following:

8          a.    Alien smugglers will use cellular telephones because they are mobile
9             and they have instant access to telephone calls, text, voice messages,
10            camera, internet, and various applications which can be used to aid them
11            in their illicit activity.

12         b.    Alien smugglers will use cellular telephones because they are able to
13            actively monitor the progress of the aliens while they are in transit.

14         c.    Alien smugglers and their accomplices will use cellular telephones
15            because they can easily arrange and/or determine what time the aliens
16            will arrive at predetermined locations.

17         d.    Alien smugglers will use cellular telephones to direct drivers to
18            synchronize an exact drop off and/or pick up time of the aliens.

19         e.    Alien smugglers will use cellular telephones to notify or warn their
20            accomplices of law enforcement activity to include the presence and
21            posture of marked and unmarked units, as well as the operational status
22            of checkpoints and border crossings.

23         f.    Alien smugglers and their co-conspirators often use cellular telephones
24            to communicate with load drivers who transport the aliens.

25         g.    Conspiracies involving alien smuggling often generate many types of
26            evidence including, but not limited to, cellular phone-related evidence
27            such as voicemail messages referring to the arrangements of travel and

28

1           payment, names, photographs, text messages, and phone numbers of co-

2           conspirators.

3     10.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity

4 modules, are smart cards that store data for cellular telephone subscribers. Such data

5 includes user identity, location and phone number, network authorization data, personal

6 security keys, contact lists and stored text messages. Much of the evidence generated by a

7 smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been

8 utilized in connection with that telephone.

9     11.    Based upon my training and experience as a USBP agent and consultations

10 with law enforcement officers experienced in smuggling investigations, and all the facts and

11 opinions set forth in this affidavit, I have learned that cellular/mobile telephones often

12 contain electronic records, phone logs and contacts, voice and text communications, and

13 data such as emails, text messages, chats and chat logs from various third-party applications,

14 photographs, audio files, videos, and location data. This information can be stored within

15 disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent

16 files contained on or in the cellular/mobile telephone. Specifically, based upon my training

17 and education, I have learned that searches of cellular/mobile telephones associated with

18 smuggling investigations yield evidence:

19     a.    tending to indicate efforts to smuggle undocumented aliens from

20         Mexico to the United States or smuggle undocumented aliens further

21         into the interior of the United States;

22     b.    tending to identify other facilities, storage devices, or services such as

23         email addresses, IP addresses, phone numbers that may contain

24         electronic evidence tending to indicate efforts to smuggle

25         undocumented aliens from Mexico to the United States or smuggle

26         undocumented aliens further into the interior of the United States;

27     c.    tending to identify co-conspirators, criminal associates, or others

28         involved in smuggling illegal aliens from Mexico to the United States

or smuggling undocumented aliens further into the interior of the United States;

d.  tending to identify travel to or presence at locations involved in smuggling undocumented aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States, such as stash houses, load houses, or delivery points;

e.  tending to identify illicit proceeds, cash, checks, wires, bank accounts, financial records, financial transactions, ledgers, or other information related to proceeds derived from smuggling undocumented aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States;

f.  tending to identify the user of, or persons with control over or access to, the subject phone; or

g.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

## PROBABLE CAUSE

12.  According to his report, on June 1, 2019, USBP Agent David Chisum was conducting assigned canine (K-9) patrol duties in Jacumba Hot Springs, California, within the Boulevard Border Patrol Station's Area of Operation. Agent Chisum was in full Border Patrol rough duty uniform and working with his K-9 partner Duco (CCEP# 170225).

13.  According to Agent Chisum's report, at approximately 10:22 p.m., USPB Agent Juan Orozco, who was operating a Mobile Surveillance Capabilities scope truck on an elevated position known as "Table Top", advised Agent Chisum that he had observed two subjects approaching Old Highway 80, north of a landmark known to Border Patrol Agents as "Airport Mesa." Airport Mesa is a large hill that lies directly on the United States International Boundary with Mexico. Due to Airport Mesa's location and geographical layout, this area is used frequently by illegal aliens attempting to further their entry into the

*Affidavit in Support of Search Warrant*                                    6

1   United States. Specifically, its elevated topography is difficult for scope operators to
2   monitor. Furthermore, Airport Mesa has many ridges and saddles through which illegal
3   aliens traverse on foot, hiding them from the view of the scope operators. Consequently,
4   illegal aliens can cross into the United States atop Airport Mesa with little to no detection.

5   14.   According to Agent Chisum's report, at approximately 10:23 p.m., Agent
6   Orozco advised Agent Chisum that he had observed the two subjects enter a vehicle on Old
7   Highway 80. This area is approximately 1,100 yards north of the United States International
8   Boundary with Mexico. Agent Orozco continued to monitor the vehicle as it traveled
9   westbound on Old Highway 80 towards the town of Jacumba Hot Springs. Agent Orozco
10  advised Agent Chisum that he had observed the vehicle turning around near a landmark
11  known to USBP Agents as "Duncan's" and continue back eastbound on Old Highway 80.
12  It was at this time that Agent Chisum made visual contact with the vehicle.

13  15.   According to his report, at approximately 10:26 p.m., as Agent Chisum was
14  attempting to catch up to the vehicle and request a stolen vehicle/registration check, the
15  driver of the vehicle pulled over on his own near a landmark known to USBP Agents as
16  "Napa Road" on Old Highway 80. Agent Chisum activated his emergency lights and pulled
17  in behind the vehicle, now identified as a 1999 Black Honda Civic, bearing California
18  license plate 8JAS082 ("the Vehicle").

19  16.   According to his report, as Agent Chisum approached the Vehicle on foot, he
20  ordered the driver, later identified as Ronald THOMAS Jr., to turn off the vehicle to which
21  THOMAS complied. Agent Chisum approached the vehicle from the passenger side and
22  observed that the subjects in both the rear and passenger seat were wearing "booties."
23  "Booties" are pieces of cloth, typically cut from a blanket, that illegal aliens tie around their
24  shoes in order to make it more difficult for USBP Agents to follow their shoeprints. Upon
25  observing the two subjects wearing "booties," Agent Chisum then approached THOMAS
26  and identified himself.

27
28

*Affidavit in Support of Search Warrant*          7

17. According to his report, Agent Chisum ordered THOMAS to exit the vehicle and stand at the front. Once THOMAS was outside the vehicle, Agent Chisum placed THOMAS in handcuffs and performed an immediate area search of THOMAS.

18. According to his report, Agent Chisum then identified himself to the two passengers. Agent Chisum questioned both subjects individually as to their country of citizenship. Both subjects, later identified as Yimy Rosas-Marcelino and Marcial Romero-De Los Santos, admitted to being citizens of Mexico. Agent Chisum then asked both subjects if they were in possession of any immigration documents that would allow them to enter or remain in the United States legally. Both subjects admitted they did not possess any such documents. At approximately 10:26 p.m., Agent Chisum placed THOMAS, Rosas, and Romero under arrest. All three subjects and the Honda Civic were then transported to the Boulevard Border Patrol station.

19. **Target Device 1, Target Device 2, Target Device 3, and Target Device 4**, were discovered during a search incident to arrest of the three individuals, THOMAS, ROSAS, and ROMERO.

20. According to USBP Agent Casimiro Cavazos' report, on June 2, 2019, at approximately 1:32 a.m., THOMAS, provided Agent C. Cavazos with a post *Miranda* statement in the English language as witnessed by USBP Agent M. Molina. THOMAS stated he currently resides at 620 Melba Road, Encinitas, California 92024. THOMAS stated he was arrested by Border Patrol Agents after having picked up two illegal aliens on Old Highway 80 in Jacumba, California. THOMAS stated that his last job was working with Denzel Washington in "Fences" about a year and a half ago and currently works for his girlfriend occasionally as a laborer. THOMAS stated on June 1, 2019, he was traveling to the Jacumba Hot Springs located in Jacumba, CA. THOMAS stated he had plans on meeting some girls and to chill at the Jacumba Hot Springs. THOMAS stated that while driving, he accidently missed the exit to Jacumba and was trying to make his way back to Jacumba. On his way back, THOMAS stated he saw two individuals walking next to the road. THOMAS stated he was not sure what he saw and turned his lights off and on to make

*Affidavit in Support of Search Warrant*                    8

1  sure he was not seeing things. THOMAS stated the two individuals were waving their arms
2  and he thought they broke down so he decided to pick them up offering them a ride.
3  THOMAS stated he did fear for his safety as he was in possession of a firearm. THOMAS
4  stated he drove for a short distance and was startled by an agent driving 100 mph in his
5  direction and pulled over to the side. Once THOMAS pulled to the side, he stated that a
6  Border Patrol Agent pulled behind his vehicle conducting a vehicle stop. THOMAS stated
7  he felt as if he was at the wrong place at the wrong time and he had money. The interview
8  concluded at 1:50 a.m.

9      21.   According to Agent Casimiro Cavazos' report, on June 2, 2019, at
10  approximately 3:39 a.m. ROSAS provided a statement in the Spanish language to Agent C.
11  Cavazos. The statement was witnessed by USBP Agent M. Molina at the Boulevard Border
12  Patrol Station in Boulevard, California. ROSAS stated that he was born in Veracruz,
13  Mexico, and that he was present in the United States without any legal documents allowing
14  him to remain in the United States. He stated that he departed Veracruz, Mexico on May
15  23, 2019 via plane to Tijuana, Baja California, Mexico and stayed at a small house for a
16  day. ROSAS stated he made smuggling arrangements with a smuggler he identified as "El
17  Cholo" via cell phone in Tijuana. ROSAS agreed to pay a smuggling fee of $6,700.00 USD
18  with a final destination to Pasco, Washington. ROSAS stated that "El Cholo" told him to
19  take a bus from Tijuana to El Hongo, where several masked men picked several others and
20  him up in a white van. They were dropped off near the U.S./Mexico boundary line in the
21  mountains and walked to the U.S./Mexico boundary fence as instructed by the masked men.
22  ROSAS was then instructed to walk around the border fence, near the bottom of the
23  mountain, and walk north into the U.S. to the freeway. There he was to wait until his ride
24  picked him up. The vehicle would honk to identify itself as his ride. ROSAS stated that a
25  car stopped in the traffic lane and turned off the lights and turned them back on. He stated
26  he knew this was his ride because it was not the Border Patrol. He attempted to open the
27  rear passenger door but it was locked. The driver unlocked the door and ROSAS boarded
28  the car in the rear passenger seat. ROSAS stated that the driver did not tell them anything

*Affidavit in Support of Search Warrant*                          9

1  and only gestured for ROSAS and the other subject, later identified as ROMERO, to wear
2  their seatbelts. ROSAS stated that they drove for approximately five minutes until a vehicle
3  passed them, made a U-turn behind them, and pulled them over. ROSAS stated that that it
4  was the Border Patrol and they were arrested.

5       22.     According to Agent Casimiro Cavazos' report, on June 2, 2019, at
6  approximately 4:24 a.m. ROMERO provided a statement to USBP Agent C. Cavazos in the
7  Spanish language.  USBP Agent M. Molina witnessed the statement at the Boulevard
8  Border Patrol Station in Boulevard, California.  ROMERO stated that he was born in
9  Veracruz, Mexico, and that he was present in the United States without any legal documents
10 allowing him to remain in the United States. ROMERO stated that he departed Veracruz,
11 Mexico approximately 15 days prior via bus to Mexicali, Baja California, Mexico. He made
12 smuggling arrangements with a smuggler he identified as "Hector" via cell phone in
13 Mexicali for a smuggling fee of $5,000.00 USD.  His final destination was Concord,
14 California. ROMERO stated that he took take a bus from Mexicali to La Rumorosa. Once
15 arriving in La Rumorosa he was met by another smuggler and taken to an abandoned house
16 in a white Explorer type vehicle. ROMERO stated that was dropped off at the house where
17 he stayed for about two weeks.  The house was in a small town near the U.S./Mexico
18 boundary. ROMERO stated that he walked to the U.S./Mexico boundary accompanied by
19 a smuggler named "El Cholo".  Once near the fence, "El Cholo" instructed ROMERO to
20 walk towards the lights in the distance where there was a gas station. ROMERO stated that
21 "El Cholo" instructed him to hide near the gas station and wait for a car to stop near his
22 location to be picked up. ROMERO stated he waited for about three hours until a vehicle
23 stopped at his location. ROMERO stated that once the car stopped he opened the passenger's
24 side front door and boarded the vehicle. ROMERO stated that after he was in the car the
25 driver asked him in broken Spanish where he was going to which he replied, "Los Angeles."
26 The driver told him "about an hour." ROMERO stated that they drove off and made a U-
27 turn and were pulled over by Border Patrol Agents. ROMERO stated that when the agent
28 approached the vehicle he was asked if he had any documents and he answered, "No."

*Affidavit in Support of Search Warrant*                    10

23.   On July 12, 2019, counsel for ROSAS and ROMERO proffered the following information regarding **Target Device 3** and **Target Device 4** to the assigned Assistant United States Attorney. According to ROSAS and ROMERO's counsel, **Target Device 3** was last used one day before crossing into the United States and ROSAS did not receive any instructions from the smugglers on that phone after ROSAS and ROMERO crossed into the United States. Counsel further proffered that **Target Device 3** only contains photos, music, contacts, and text and voice messages that do not pertain to the smuggling event. Similarly, counsel further proffered that ROMERO's phone, **Target Device 4**, was not used during the smuggling event, contains personal data only, and was not used after crossing into the United States. Finally, counsel proffered that **Target Device 2** is the phone that was given to ROSAS by the smugglers in Mexico and communicated instructions to ROSAS and ROMERO on that phone after they crossed into the United States.

24.   It is my belief that even though counsel has represented that **Target Device 3** and **Target Device 4** were not used during the smuggling event, because those devices were used right up until ROSAS and ROMERO crossed into the United States, those phones may have information that is relevant to this investigation, based on my training and experience in alien smuggling investigations.

25.   Based upon my experience and investigation in this case, I believe that THOMAS, as well as other persons as yet unknown, was involved in an on-going conspiracy in alien smuggling from Mexico into the United States. **Target Devices 1-4**, were used to coordinate with co-conspirators regarding the smuggling of the illegal aliens, and to otherwise further this conspiracy both inside and outside the United States. I also know that recent telephone calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites like Facebook, pictures and other digital information are stored in the memory of cellular telephones which could potentially identify other persons involved in alien and narcotics trafficking activities.

26.   Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the alien smuggling activities of THOMAS and his co-conspirators, as well as ROMERO and ROSAS, such as telephone numbers, made and received telephone calls, contact names, electronic mail (email) addresses, appointment dates, email messages, messages and posts from social networking sites like Facebook, pictures and other digital information are stored in the memory of the cellular telephone described herein.

## METHODOLOGY

27.   It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the

1  results using digital photography. This process is time and labor intensive and may take
2  weeks or longer.

3      28.    Following the issuance of this warrant, I will collect **Target Devices 1-4** and
4  subject them to analysis. All forensic analysis of the data contained within the telephones
5  and their memory cards will employ search protocols directed exclusively to the
6  identification and extraction of data within the scope of this warrant.

7      29.    Based on the foregoing, identifying and extracting data subject to seizure
8  pursuant to this warrant may require a range of data analysis techniques, including manual
9  review, and, consequently, may take weeks or months. The personnel conducting the
10  identification and extraction of data will complete the analysis within ninety (90) days,
11  absent further application to this court.

12              **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

13      30.    Other than as described above, the United States has not attempted to obtain
14  this information by other means.

15                          **CONCLUSION**

16      31.    Based on all of the facts and circumstances described above, my training and
17  experience, and consultations with other law enforcement officers, there is probable cause
18  to conclude that THOMAS, ROSAS, and ROMERO utilized **Target Devices 1-4** to
19  facilitate violations of Title 8, United States Code, Section 1324.

20      32.    Because **Target Devices 1-4** were promptly seized during the investigation of
21  THOMAS, ROSAS, and ROMERO's smuggling activities and have been securely stored
22  since they were seized, there is probable cause to believe that evidence of illegal activities
23  committed by THOMAS, ROSAS, and ROMERO continues to exist on **Target Devices 1-
24  4.** I believe that the appropriate date range for this search is from March 2, 2019, up to and
25  including June 2, 2019.

26  / /
27  / /
28  / /

*Affidavit in Support of Search Warrant*                    13

1      33.    Therefore, I respectfully request the Court issue a warrant authorizing me, an
2 Agent with USBP, or another federal law enforcement Agent specially trained in digital
3 evidence recovery, to search **Target Devices 1-4**, as described in Attachments A1, A2, A3,
4 and A4 respectively, and seize the items listed in Attachments B1, B2, B3, and B4
5 respectively, using the methodology described above.

6

7      I swear the foregoing is true and correct to the best of my knowledge and belief.

8

9                  CORY ANDERSON, AGENT
10                  U.S. Border Patrol

11 Subscribed and sworn to before me on
12 this _17th_ day of July, 2019.

13

14

15 THE HON. KAREN S. CRAWFORD
   United States Magistrate Judge
16

17

18

19

20

21

22

23

24

25

26

27

28

*Affidavit in Support of Search Warrant*         14

## ATTACHMENT A1
## PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of Title 8, United States Code Section 1324, is described below:

One Black Reevplus C3701A Cellular Phone
International Mobile Equipment Identity (IMEI) 861273030758123
**(Target Device 1)**



currently located at the United States Border Patrol Asset Forfeiture Office Evidence Vault, located at 311 Athey Ave, San Ysidro, California.

## ATTACHMENT B1
## ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. The seizure and search of the cellular telephone will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 2, 2019 up to and including June 2, 2019:

a.  tending to indicate efforts to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

b.  tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, phone numbers that may contain electronic evidence tending to indicate efforts to smuggle undocumented aliens from Mexico to the United States or smuggle undocumented aliens further into the interior of the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in smuggling illegal aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States;

d.  tending to identify travel to or presence at locations involved in smuggling undocumented aliens from Mexico to the United States or smuggling undocumented aliens further into the interior of the United States, such as stash houses, load houses, or delivery points;

e.  tending to identify illicit proceeds, cash, checks, wires, bank accounts, financial records, financial transactions, ledgers, or other information related to proceeds derived from smuggling undocumented aliens from Mexico to the

United States or smuggling undocumented aliens further into the interior of the United States;

f.    tending to identify the user of, or persons with control over or access to, the subject phone; or

g.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above;

which are evidence of violations of Title 8, United States Code, Section 1324.